Call the next case, Kenny v. Denbo. Good morning, your honors. May it please the court, I'm Robert Kenny, appellant and plaintiff pro se in this matter. I would like to reserve seven minutes for rebuttal. We'll give you five on rebuttal. That's the maximum. Okay. I'm assuming you're all familiar with the facts. We're familiar with the facts. We're here to talk about count two. What would really help us is if you walked us through understanding what these discovery rules were like, both in the internal grievance, the colonist procedures and the arbitration, and where would we find what discovery requests you or your representatives made for these emails? How do we know that these were specifically asked for and not turned over? Because that seems central to whether there was fraud. Right. I have it right here. There was a letter to the provost which was quite broad in what it requested. Do you know where in the record that is? Yes, I do. I have it here someplace. One moment, please. There was an email that asked for... Do you have a date? Do you have a record citation? I have it in here. The unit's discovery request for documents disclosed in the investigation was very broad. It asked for email records, blackboard records, correspondence, etc. That's ECF number 173-6. Is that in any of your appendices or do you have a date on it? No, I'm afraid it's in the district court record only, 173-6. I think that's citing the union rep's deposition. Help me. It is. I'm sure it's in the appendix too, someplace. Do you have the wording of the discovery request? Yeah, I was quoting it. Email records, blackboard records, correspondence, etc. We'd like to have notes, documents, and that's a direct quote. Email records, blackboard records, correspondence, etc. Relating to the investigation of the alleged breach. Right, so if it's not related to the investigation, then it wasn't responsive to the request. Correct. And was there any request that was specific about the email traffic among Denbo, Sprotzer, or University related to your use of the syllabus or the provision of the syllabus that's not related to the investigation of those things, but the underlying facts? Well, I see what you're saying. If the request from the union did not contemplate that the university would be denied some emails in their investigation. Okay, let's back a minute. You didn't make requests of your own. These discovery requests are coming just from the union rep. Is that correct? Right. That was my exclusive representative. They have exclusive jurisdiction. I couldn't ask for it myself. Okay. And for there to be a fraud claim, there has to be some misrepresentation. Right. That you asked for something, they didn't turn it over, and you were misled by the failure to turn it over. Was there anything in the rules that required them to sui sponte, turn over all the documents related to this? Or did the arbitrator request any of these things? No, to the last question, the arbitrator didn't request anything. He made his decision without any testimony. What the fraud is, is both the Department Chair Spratzer and Defendant Dembo asserted in writing that a plaintiff had used her syllabus without her permission. They failed to mention that they had given directly to the plaintiff a written copy. It's misleading because it was a partial truth that obscured facts that undercut a concrete truth. Where are the assertions that you're alleging were misleading? Where are the written assertions that Spratzer and Dembo made to you that you received in the course of the grievance or the arbitration? In Plaintiff's Appendix 411 and 493 to 94 are written assertions that the plaintiff had used her syllabus without her permission. Contradicting that were written emails that she withheld or somebody withheld contradicting that. They're sworn testimony three years. It took three years and four deposition requests to get them under oath. You say Plaintiff's Appendix. I'm looking at your appendix on the PL Volume 2 and those page numbers don't appear to be responsive. What are you citing? I thought I was citing Plaintiff's Appendix. It's their initial emails accusing him of using the syllabus without her permission. That is contradicted by her own emails that she didn't submit or somebody didn't submit. Point me to these emails. Their sworn testimony several years later contradicted the emails. Point me to the emails. One second. Discipline. I have the reference. Well, one is to the discipline letter. It says, I find that your use of Susan Dembow's syllabus without her prior permission is a violation. Three years later, they testified under oath. And from that, the union assumed, well, the pardon chair's thoughts must have taken it from his thoughts without consulting her. Where was your request for these or the union? Can you point me to anything where the union requested things beyond the investigation to the underlying provision of the syllabus? Are you aware of anything? It's not that they denied something on discovery. The defendants withheld communications that would have contradicted their story. If they withheld it, what was their obligation to turn it over? What was the source of their obligation? Well, the obligation was when the university was investigating, she gave the university apparently certain emails but not others. So the failure to disclose was in the investigation. There are emails that contradict your story. It's not discovery abuse that constitutes the fraud. It's the assertion in the initial accusatory emails that said you did not have my permission. Three years later, when they were placed under oath, they contradicted that story. In the front note, she says that she, number one, the pardon chair's thoughts are testified under oath that he solicited the syllabus. He didn't just take it out of his file without consulting with her. He solicited the syllabus from Denbo. Denbo gave it to him with complete knowledge and understanding that it was going to be given to the adjunct teaching her course. So how would this have affected the outcome of the grievance procedure, the arbitration for the settlement, if you had known this? What can we see in the record that suggests that this would have influenced any of this? It's not complicated. She alleged that the syllabus was used without her permission. That was untrue. When it came to testifying to that under oath, she backed off. She admitted that it was solicited by the pardon chair's thoughts or he didn't just take it out of his file and give it to her without consulting. But she was consulted and she consented to the use of her syllabus. The initial accusatory emails that said you used the syllabus without her permission were false. It's not complicated. When it came to testifying under oath, they pulled off short because that's perjury. They misrepresented and might have been incorrect. That doesn't make it a lie. It's a different person asserting this from the person who, Professor Denbo, who actually knew this. No, Professor Denbo said, told people in her initial accusatory emails that Kenny has used my syllabus without my permission. The pardon chair's thoughts are covered for her by saying also you used it without her permission. And the important point on this is for the remedy of rescission, you don't have to prove they lied deliberately. If they lied even, if they failed to tell the truth even negligently, and the ‑‑ But rescission is a remedy. Count two, which we've granted argument on, is fraud and equitable fraud. Right, and the remedy for that is rescission. Right, but normally there's ‑‑ I see what you're saying. Because there's a scienter requirement for fraud. Right, equitable fraud is where you merely fail to state the truth and now what the defendants have said, well, there's no proof. There was reliance. In the record, there is proof that the union, for its part, assumed that the pardon chair's thoughts or took the syllabus from his files without consulting defendant Denbo. That's not true. And they testified, when it came to testifying under oath, the story changed. Was the extent of the use in dispute? No, no, it's just he had no permission. I mean, I have taught courses and I got a syllabus from another ‑‑ this was trial practice from another professor. And I looked at it to plan out what I was going to do, but I didn't post it anywhere as my work. The issue of attribution is what I call that, was not what he was disciplined for. After the testimony, not backing up their allegations, their written allegations, the defendants tried to make the discipline about something else that they did testify consistently on. All of a sudden, the offense became no attribution. Okay? Every witness in this case testified they've never seen or heard of attribution of a syllabus, including defendant Denbo, under oath. Okay? Briefing Officer Halpin said, if it was about attribution, it would have helped immensely. Because nobody's ever heard of that. This may be the first case in this country where a professor has sued over plagiarism, alleged plagiarism of a syllabus. Mr. Kennedy, you've got five minutes for rebuttal, so we'll get you there. Okay. Thank you, sir. Mr. Gerber? May I please call Steve Gerber, attorneys for Rye University, and Professor Susan Denbo. Let me start with the large conflation in the case which was just identified in Judge Roth's question. Continually and throughout this case, plaintiff's argument has conflated erroneously. His receipt of Dr. Denbo's syllabus, with her name on it and the content therein, admittedly so he could look at it, for the purpose of framing his own syllabus with what he did, which was copying it wholesale and posting it on his own name. As the district court says, Mr. Kennedy knows how he received the syllabus. I took Mr. Kennedy's theory to be different from the one the district court understood it to be. The district court thought this was all about his state of mind. I took Mr. Kennedy's theory, liberally construed to be a jury would look at the factual issue of permission differently if it knew that Professor Denbo had, in fact, turned this over, and he hadn't just taken it from some general file of all the syllabi online. So I thought the district court didn't quite get what he was getting at in terms of she really did get permission. It cast the whole thing in a new light. And the district court had a lot of sympathy for Mr. Kennedy. The district court said, your client, Professor Denbo, has greatly overreacted here to what's pretty common borrowing in the academic world. Now, the scale of the borrowing should have been changed more or less, but the district court had some real sympathy. And if the district court had understood his theory correctly, especially in light of this withholding, mightn't the result, the decision to settle, have been different? No, Your Honor, respectfully, it would not. The district court expressed sympathy for Mr. Kennedy, but the district court also made it clear that, one, and this is undisputed, that under the collective bargaining agreement, the syllabus was Dr. Denbo's intellectual property. That is undisputed. That was bargained for. The collective bargaining agreement governed the grievance. And, indeed, that is the sole remedy for the discipline that was at issue. The issue is not, as the record below makes clear, whether or not Dr. Denbo intended for him to read it, to have it, or Dr. Spratzer have it. He knew he received it, it had Dr. Denbo's name on it, and he copied it intact. Can you enlighten us on the discovery issues here? What are the discovery rules here? Your Honor, when you come and you think you have everything you need, you don't have absolutely everything you need. I believe in the record below, but I don't believe it's in Mr. Kennedy's appendix, nor do I believe off the top of my habits and mind. The discovery provisions are governed by the arbitration and the arbitrator. The request by the union, and this is referenced in Dr. Halpern's testimony, and, indeed, it's even referenced in his letter, which is annexed to the Castanero certification, and I can give the DA reference to that, DA 1661 is the union's letter. The union requested the documents that the provost relied upon in the provost's letter imposing the discipline. That letter is DA 66, and it makes reference to the syllabus that Mr. Kennedy received, which was Dr. Denbo's syllabus, and that's in the record, that's appendix attachment A, and it makes reference to Mr. Kennedy's, quote, his record of unauthorized use of the syllabus about a week and a half before the course began, when, quote, Professor Kennedy posted Professor Denbo's syllabus virtually unchanged as his own and without acknowledgment on January 14, 2012, about a week before. The only thing the union asked for were the documents that the provost, Dr. Stephen, relied upon. There was no separate and independent procedure for discovery. The CBA provides that there's an arbitrator who shall determine it. Of course, under United Morin Morgens and its progeny, those arbitrations are intended to be final, as they are, and for that reason, by the way, there can be no rescission. The right to bring the grievance and the sole authority to bring the grievance over the discipline is that of the union. Mr. Kennedy consented to the settlement, but he was not the party which could bring the grievance. If there were fraud, if there were deliberate fraud, we would balk at enforcing that. We might have stopped somebody or saved that person of unclean hands. Right, but there was no deliberate fraud, and there was no equitable fraud, and the courts point below where it says that no jury could reasonably find that Mr. Kennedy reasonably relied, which is, as you know, an objective standard, upon whether or not three e-mails did or did not come over. When there was no procedure for wholesale discovery, these proceedings are very, if you look at the CBA, which is in the full record, and I forget the DA site, the collective bargaining agreement, it provides for step one, step two, step three, 14 days, 14 days, 30 days to an arbitration. There's no discovery proceeding in there. All right, so that's the position of the law. Let me ask, why haven't your clients settled this matter? Just as a matter of equity, the district court pointed out your client, Professor Denbo, overreacted greatly. The union representative, Halprin, testified, never heard of anybody going ballistic over the use of a syllabus. So why take this issue all the way up? Well, Your Honor, because we were sued. Let me just back up on that. The issue of whether or not Professor Denbo's language, while not rigorous, was intemperate, is really not the subject of this point that the court's critical. I'm not concerned about the language. I'm concerned about the behavior of a powerful full professor who has a lot of sway with the university, coming after an adjunct professor over what in the grand scheme of things the district court finds and our experience is not that big a deal. Well, Your Honor, it might not be that big a deal were the core underlying fact different. The core underlying fact that makes it a bigger deal here is that the collective bargaining agreement and the union perhaps unusually bargained expressly that syllabus were the intellectual property of a professor. And to the extent I don't concede that she, quote, overreacted, she created a brand new graduate level course that was then incorporated in the Masters in Business Administration. She intended to write an article about it, an academic article about it. She developed all these course materials. The syllabus that he produced also included designations of sections and readings and the like. And it was intellectual property of hers pursuant to the university's agreement with the union. So it's not perhaps as in some other institutions. And Mr. Kennedy was a professor there and a member of the collective bargaining unit at that time for I think about 15 years. It's well known that that is wider faculty members' intellectual property. And that's the reason why the university exacted the discipline it did. As the provost wrote, and I think that this is rather telling, issues about whether or not it was inadvertently or at or intentionally available, issues of whether or not it was given with knowledge that the adjunct was going to use it, that's not the issue. The issue is the use of another's intellectual property without permission to use it as your own. It's the use as his own, as the provost said, that was the telling factor. And that's a Casagnaro assert that's really never been disputed, that that was the core of the case. And that's what sets it apart, respectfully, Your Honor. It's not just I read the syllabus, I like this idea of a concept about an SEC issue for business ethics in terms of Section 9B for course in business ethics for MBA students. That's not the issue. The issue is the title of it, the class, the homework assignments, and the like. All that is intellectual property. It's as if, Your Honor, the argument would be, I write an article and somebody else takes out sections of my article and publishes it as their own. That's what has occurred here. The syllabus was Dr. Denbo's, he knew it was hers, it had her name on it, and he literally copied it changing eight minor alterations that are undisputed. So I don't think it was an overreaction in the context of, it's her intellectual property, the faculty all know that intellectual property is there, and the fact that Mr. Kenny chose to copy the property because he didn't have time, because he was away over eight weeks, to create his own syllabus doesn't set it apart. Let's go back to the legal issue that Mr. Kenny raised with us, which is there is something misleading about putting forward an assertion that he used this without permission and saying Spotser gave Kenny the syllabus and omitting the fact that Denbo gave Spotser the syllabus. I'm not sure whether a jury might find that Denbo's handing the syllabus over might have authorized more generous or more complete or more verbatim use of the syllabus than maybe Spotser, than maybe even Denbo thought she was authorizing, but it could reasonably have been understood that way. Doesn't that look like a perhaps material omission, in turning over a whole bunch of other emails and then leaving these out? No, Your Honor, and the three emails in question don't really bear on that, and I can point out for you where they are because it's not clear. The three emails are referenced in the paragraphs 86 through 88 of the Fourth Amendment complaint, and so one of them is an email from the Office of Technology person back to Professor Denbo in the first place, talking about this blackboard system and whether or not she had intentionally, quote, elected to allow stuff to be seen by others in the university or not. And by the way, so on that email, the fact that you publish an article doesn't mean that somebody can copy an article. The fact that the syllabus was on the blackboard or not on the blackboard is not material. The second so-called undisclosed email is an email talking about later learning or learning at that time that there was a new general default of the blackboard update. Same issue, same not material relevance. The issue is not whether it was published in Time magazine, whether it was published online, or in the University of Pennsylvania Law Review. The issue is taking somebody else's work and copying it. And the third email was that Denbo had given him the syllabus. Well, Kenny believed it was available according to his own submissions, the union's submissions, because he saw it on the blackboard. Availability does not equate to passing it off as his own. Use does not mean one cannot read it. Yes, he had the opportunity to read it. People in the university had the opportunity to read it, just as they would a published article. Using it as your own was the evil. And that is an evil in the academia. Thank you very much, Mr. Gerber. We'll hear Mr. Kenny on rebuttal. Mr. Kenny, could I ask you to begin with this question? Is there any evidence in the record that Provost Stephen reviewed any of the three emails in question? There's some circumstantial evidence. The packet that was handed over to the union had some strikeouts, as if three pages had been removed. There was a number there that was originally 75, and it was changed to 72. The packet that was given to the union when, at the hearing? Before the hearing, in response to their discovery request. So the inference you're drawing from that is that somebody reviewed the package and took the three emails out of the package. Possibly. Because it's three pages. And we don't know whether that was Provost Stephen or someone else. In his office or somebody else. I want to get very quickly out. The charge was not exact copying. The charge was not no attribution. Grievance Officer Halpern has testified if it was attribution, that would have been easy. It would have been even easier if it was exact copying. Plaintiff has submitted exact copies of Denbo's materials they had copied in the past with Denbo's knowledge and approval. Respectfully, I don't think we want to re-litigate the merits of that. The issue here is could you plead a fraud action. The issue on that, I think, comes down to you're saying, and correct me if I'm wrong, as I understand it you're saying I really would have liked to have seen these three emails before I decided to take the rep's advice and settle this case. But that's not the fraud. What is the fraud? The fraud is both Department Chair Spratzer and Defendant Denbo asserted that I used their syllabus, her syllabus, and I broke into her Blackboard site. Well, that's false testimony in the course of the administrative hearing process, right? Yes. That's different than a common law fraud action. The thing that proves it's fraud is they reversed themselves when they were placed under oath. In other words, in the accusation is you used the syllabus and you broke into a Blackboard course board to get the syllabus, and three years later when I finally get them under oath they reverse themselves. No, I gave it to Department Chair Spratzer, both of us fully knowing that it was... No, Defendant Denbo admitted that she gave you the syllabus. And with her permission. Right, but you're saying that wasn't her first position. No, the whole allegation, there would be no discipline... But then why isn't that a good thing? I mean, why isn't it... to the extent she later admitted that, no, actually I gave it, I did give it to him, with my permission, that's a good thing, right? It would have been a lot worse if she had, under your theory, lied and said, oh, no, I didn't give it to him, he just... She did lie in those emails that were the sole basis of my discipline. But isn't it your position that the discipline morphed over time? I understand your complaint to be that, you know, I was under attack here, and I'm fighting an ever-changing battle, because they say one thing at one point in the process, and then they change, and it keeps changing. Well, once you just post it under oath, they both can't be true. But you can't... do I then understand that your fraud action is that... That she... You want to undo and then redo or avoid having to go through the administrative process, because it... It was based on fraud. It was based on... Misrepresentation. It was based on misrepresentation. Yeah, very clearly. This is not complicated. She very clearly said, I used her syllabus without her permission, and then when she was placed under oath, she contradicted it. So they both can't be true. Right, but once the people at the school decided whether discipline is appropriate, they presumably took into account what she said late at the hearing, which was, yeah... No, no, no, I'm sorry. I'm terribly sorry. That was in this lawsuit. That was in the American ICS. Two days later, after pressing discovery with four deposition requests, we find out that Department Chair Spratzer admits that he solicited from her, and they both admitted that she gave it with her permission. In other words, she misstated in the arbitration. So one of the things I want to get in is... Well, you... There's an email between you and Professor Denbo in January 23rd, and you have admitted there that you asked her permission. Because she was aware of everything, and you were aware of everything. No, what I asked her permission about was using other resources. Her original allegation and why she went so ballistic was, I posted syllabus listing her course resources and student assignments. She jumped to the conclusion, well, he's using my assignments. Right? Sworn testimony. And the allegation about resources was dropped even before the discipline was imposed. Because it was very clear her resources had not been placed on my Blackboard site. All she had to do was look at it, and she would have seen that. So that was dropped. The resources allegation was dropped immediately because it was unmistakably untrue. What the email you're referencing is, is when I called her and asked her if I could use anything else other than the syllabus. You've already given me the syllabus, and I know I can use that. And I had an exact copy of her work in the past. And when I was appointed priority adjunct, I was praised for that because I was borrowing from the faculty and using them as leadership. Please look at the collective bargaining agreement, which suggests that syllabus may be intellectual property in certain circumstances. Department chair's grievance officer Halpern stated under oath, it has to have creative content to be intellectual property. I really want to get this in because this collective bargaining agreement says syllabus can be intellectual property. Where do you want to point us to? Where in the record should we look? That is the CBA, it's dependence appendix 470-471. It says, as a matter of principle, the university encourages the members of the bargaining unit and all members of the university community to publish without restriction their papers, books, and other forms of communication in order to share openly and fully their findings and knowledge with colleagues and the public. The academic ethics is we want the broadest distribution. Consider, if you will, what happens to the university if every adjunct has to start from scratch. The persons that have been mentioned in this case are the ones that are hurt, the students. It is harder to maintain continuity if every adjunct has to start from scratch. Also, so when she says... Mr. Kenny, we're running past your time, but do you want to make a couple of quick concluding points? Yes, two things. This court deals with a lot more serious matters. You deal with pain, you deal with death. I'm in pain. Who is going to hire a 70-year-old adjunct with a stain on his record? Also, what she's asking for here is directly... She's asserting that we pass on syllabi. That's why they have that in the collective bargaining agreement. We want the widest available distribution of our academic work. And they weren't even thinking about a syllabus. They were thinking about copyrighted articles, copyrighted research, that sort of thing. Least of all a syllabus. Thank you, Mr. Kenny. The court appreciates the argument of both sides, and we assure you we take this matter with the utmost seriousness as we do all our cases. The court will take the matter under advisement.